| | | |
|---|---|---|
| **ERIC WAYNE MOSS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **BUDDY HARWOOD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 45). Also pending are Plaintiff's "Declaration in Support of Motion for Appointment of Counsel," (Doc. No. 37), and Motion to Compel and Request for Production of Documents, (Doc. No. 39).

## I.     BACKGROUND

Plaintiff filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983 that passed initial review on his claim of deliberate indifference to a serious medical need and for the deprivation of due process with regards to a jail disciplinary proceeding. (Doc. Nos. 1, 14). The Defendants are Madison County Sheriff Buddy Harwood, and Madison County Detention Center Sergeant Frances Denton,[1] and Captain Tom Banks. Defendants have now filed a Motion for Summary Judgment that is before the Court for review. (Doc. No. 45).

**(1)     Complaint** (Doc. No. 1)

Plaintiff alleges that Defendant Denton put Plaintiff in on 30-day disciplinary confinement for a weapon found in Plaintiff's cell, which houses two people, on April 1, 2018. On April 3,

---

[1] "Francy Dention" in the Complaint.

2018, Defendant Harwood placed Plaintiff on indefinite lockdown. On April 15, 2018, Plaintiff asked Defendant Banks for a disciplinary hearing and Banks stated "I'll pray for you." (Doc. No. 1 at 3). The Defendants went against their disciplinary procedures by placing Plaintiff in indefinite confinement without a proper hearing.

While he was on disciplinary confinement, Plaintiff was not provided with adequate medical treatment for a thyroid condition, ADHD, and PTSD. He appears to allege that medication is needed to control his medical and mental disorders. Plaintiff asked Defendants Banks and Harwood for access to the kiosk to request medical treatment and grievance procedures but he was told "absolutely not your [sic] on lockdown." (Doc. No. 1 at 4). Plaintiff claims that he finally received thyroid medication on April 18, 2018, after writing to Defendant Banks, but that he still has no treatment for ADHD and PTSD. As of the date the Complaint was filed on April 25, 2018, Plaintiff was still on lockdown, officers refused to bring him grievance forms, and he is not allowed on the kiosk to submit grievances and medical requests.

Plaintiff seeks injunctive relief and compensatory damages.

 (2) **Defendants' Motion for Summary Judgment** (Doc. No. 45)

Defendants argue that the § 1983 due process claim is barred by the Prison Litigation Reform Act because Plaintiff failed to exhaust the Jail's grievance procedure with regards to that claim before filing this lawsuit.

Plaintiff's claim of deliberate indifference to a serious medical need should be dismissed because Defendants were not deliberately indifferent. Plaintiff received medical treatment while he was on lockdown, and Plaintiff cannot show substantial harm due to any delay in treatment. Defendants argue that they are entitled to qualified immunity because there was not constitutional violation and, even if Plaintiff can demonstrate deliberate indifference, there is no evidence that

the non-medical Defendants knew about and disregarded an excessive risk to Plaintiff's health and safety, nor is there any evidence that Plaintiff's condition worsened, was life threatening, or that Defendants intentionally ignored the situation and refused to seek medical attention.

**(3)** **Plaintiff's Responses** (Doc. Nos. 49, 54)

The Court issued an Order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), instructing Plaintiff about the importance of responding to, and the standard applicable to, Defendants' Motion for Summary Judgment. (Doc. No. 47).

Plaintiff filed a verified Declaration docketed on May 28, 2019, (Doc. No. 49), arguing that he was never served a disciplinary report and never saw one until Defendants responded to a discovery request. The Report shows that neither Plaintiff nor Defendant Denton ever signed the report, and that when Plaintiff was asked about a weapon, he denied it twice. The Report also says "plea Responsible," which shows it was created later. (Doc. No. 49 at 2). Plaintiff also asserts that he was clearly deprived of medical attention for periods of months. He was admitted to Madison County Jail on March 5, 2018 and told Officer Jones during booking that he has mental health conditions and thyroid disease, informed Tom Bank of his request to be seen at medical, and said that his medication was at Mashburn Pharmacy which had never been picked up. Plaintiff said he needed to be seen at RHA but he was not seen for two months. On May 8, 2018, he was finally seen and given his medications for PTSD, ADHD, anxiety, and depression. When the medications ran out 30 days later, Plaintiff pleaded with Defendant Denton and "all officers" for another appointment with RHA and to pick up medications at the pharmacy. (Doc. No. 49 at 3). However, Plaintiff never received any more medication and was not seen at RHA for another two months.

When Plaintiff was put on lockdown, he was not allowed out of his cell except to get food trays. Throughout the lockdown time, Plaintiff had to rely on other inmates to access his account

on the kiosk where Plaintiff could file medical requests and grievances. Giving access to Plaintiff's account also gave access to make phone calls and transfer money; it is difficult to find trustworthy people in Jail with this information. This is one reason for the delay in filing a grievance. Plaintiff asked several times for a paper copy of a grievance forma and he was never given one. Nor was he provided with religious materials or toiletries. Plaintiff finally had Inmates Tennessee and Miami file grievances for him. Plaintiff made every possible attempt to comply with the grievance procedure and should not be held at fault for being denied access to the kiosk and paper forms while he was on lockdown. The records show that Plaintiff was finally given a chance to file grievances and medical requests when he was given a chance through other inmates and on his own behalf when he was released from lockdown. Plaintiff asks the Court to grant Plaintiff summary judgment based on evidence from which a reasonable jury could return a verdict in his favor.[2]

Plaintiff then filed a Motion for Extension of Time to file a response, which was granted, and he filed a second Response that was docketed on June 24, 2019. (Doc. No. 54); see (Doc. Nos. 51, 53). Plaintiff argues that he was a pretrial detainee who could not be punished at all, and therefore, he was not required to exhaust administrative remedies before filing his Complaint. Plaintiff filed several grievances through other inmates at the Madison County Jail because Plaintiff was in lockdown. Plaintiff also asked staff at the Jail for access to the kiosk and for paper grievance forms, writing paper, and hygiene products on numerous occasions. North Carolina District Courts have also stayed proceedings to allow for exhaustion, knowing that jails and prisons

---

[2] Plaintiff alternatively asks the Court to dismiss this case "with prejudice" so that he has extra time "to admin." (Doc. No. 49 at 6). Based on Plaintiff's subsequent filing of a motion for an extension of time, and his opposition to Defendants' Motion for Summary Judgment, it does not appear that he is truly seeking dismissal of this action with prejudice, but rather, he is seeking additional time to respond to Defendants' Motion for Summary Judgment.

do not always comply with their own policies and administrative procedures. Plaintiff appears to assert that he completed the exhaustion procedure before the Court's frivolity review of the Complaint and that he therefore complied with the exhaustion requirement.

With regards to the deliberate indifference claim, Plaintiff argues that his thyroid condition, PTSD, ADHD, and major depressive disorder for which he was prescribed medication, are serious medical conditions. He requested medication to control these disorders shortly after arriving at the Jail around March 4, 2018 and told Intake Officer Billy Joe Davis about his medications at intake. Defendants purposefully denied or delayed the medications and scheduled medical appointments. Plaintiff had to submit another request for medication for his thyroid condition and PTSD disorders on March 16, 2018. Jail Administrator Tom Banks responded on March 20 and noted that Lance in the pharmacy would check on this and fill it at Mashburn. It took staff another four weeks, around April 11, 2018, to get Plaintiff's medications. Plaintiff requested his medications and mental health appointments numerous times through grievances and medical requests. On April 22, 2018, after receiving thyroid medication, Plaintiff submitted a grievance through a fellow inmate for his appointment with the RHA mental health clinic and for medications for his ADHD, PTSD, and major depressive disorder. Jail Administrator Banks responded on April 23, 2018, that "I will have you seen by RHA." (Doc. No. 54-1 at 9). It took Defendants 27 days after that to bring Plaintiff to RHA so that he could be prescribed his "much needed" medications. (Id.). Plaintiff was seen at RHA mental health clinic on May 8, 2018, at which time Dr. Frank Russo prescribed Plaintiff medications for his ADHD, PTSD, and major depressive disorder. On June 6, 2018, Plaintiff advised Defendants that he needed a refill of his psych medications and filed a grievance through a fellow inmate. On June 21, Plaintiff requested psychiatric help via Dr. Russo because he was out of his medications. On June 26, 2018, Plaintiff again requested mental health treatment.

After Plaintiff had been out of his psych medications for 27 days, Plaintiff again advised Defendants that he was out of his medications on July 3, 2018. Plaintiff submitted more grievances on July 18, and August 6, 2018, requesting his psych medications and an appointment at RHA. Plaintiff was finally taken to RHA to see Dr. Russo on August 14, 2018, at which time he had been out of psych medications and had not seen Dr. Russo for two months. On August 15, 2018, Plaintiff filed another grievance after Dr. Russo disclosed that he had ordered enough psych medications to last Plaintiff until his next appointment. Defendants simply failed to pick up his medications until Dr. Russo inquired about the delays. Plaintiff suffers from real mental health conditions that are somewhat controlled by medication, without which he suffers mental anguish that is as real as any physical injury. These conditions debilitate one slowly, persistently, and will not subside. Plaintiff risks harm without his medication with thoughts of suicide, severe anxiety, exacerbated PTSD, and mental anguish. The combination of suffering equates to substantial harm.

Defendants are not entitled to qualified immunity because Defendants' denial and delay of medications and mental health appointments were deliberately indifferent to his serious medical needs. Plaintiff was punished even though he was a pretrial detainee by being placed in lockdown for approximately 72 days without due process. Statutory and constitutional law show that Defendants' illegal actions were contrary to clearly established law.

By failing to refute Plaintiff's claims about being placed in lockdown without due process, Defendants have abandoned the opportunity to challenge Plaintiff's factual claims. Plaintiff was not afforded advance written notice, a written statement of evidence, a hearing, the opportunity to have non-attorney representation, and an impartial decision-maker. Plaintiff was placed in segregation for 72 days due to an alleged weapon being found in a cell occupied by Plaintiff and another prisoner. In this § 1983 action, Plaintiff requested discovery about Defendants' copies of

Officer Summer Gurley and Tara McKinney's official incident reports surrounding the weapon incident, but Plaintiff was told that Defendants did not have documents in response to Plaintiff's request. Plaintiff's request for a photocopy of the alleged weapon was answered the same way. When Plaintiff asked how an investigation was done without an initial incident report or alleged weapon, Defendants sent him a document entitled "Madison County Sheriff's Office/Disciplinary Report" that does not comport with the disciplinary procedural safeguards. (Doc. No. 54-1 at 20). Plaintiff was not afforded any of the due process steps that were required for the weapon incident and it was never investigated pursuant to Jail policy. The weapon incident occurred on April 1, 2018, and the beginning and ending dates in the Report are April 7 to May 6, 2018. Plaintiff was placed on lockdown on April 1 and released from lockdown on June 7, 2018. He was then locked down again for another six days before being released around June 14, 2018. Plaintiff's signature is omitted and the housing unit officer Tom Banks, Francis Denton along with omitted dates and times. (Doc. No. 45-1 at 20-21). The hearing date and time are also omitted, there is no disposition of guilt, and there is nothing checked under the evidence relied upon or finding of guilt. Nor are there any information in the section for hearing notes and there is no impartial decision-maker identified anywhere on the document. An impartial decision-maker would have made some formal decision or comments but no such findings are included because there was no disciplinary proceeding. There were no procedural safeguards before Plaintiff was placed in segregation.

Defendants did not submit affidavits or declarations in their Motion for Summary Judgment that would refute Plaintiff's asserted deprivations.

**(4)** **Defendants' Replies** (Doc. Nos. 50, 55)

In the first Reply, (Doc. No. 50), Defendants argue regarding exhaustion that Plaintiff addresses the merits of his due process claim but fails to show why he failed to comply with the

available grievance procedures. His failure to use available grievance procedures means that his due process claim is unexhausted.

With regards to deliberate indifference, Plaintiff admits that he was seen by Mashburn and received medications for PTSD, ADHD, anxiety, and depression on May 5, 2018. Any disagreement Plaintiff has with the treatments he received do not equate to deliberate indifference. Plaintiff also fails to address Defendants' argument that Plaintiff cannot show any substantial harm from a delay in treatment. He has not addressed lifelong handicap, permanent loss, or considerable pain suffered as a result of a substantial risk of harm.

In the second Reply, (Doc. No. 55), Defendants argue that Plaintiff's contention that PRLA does not apply to pretrial detainees is legally incorrect and that Plaintiff was required to exhaust regardless of the legal claim he is attempting to raise. The grievance procedure was available to Plaintiff and he filed numerous medical requests and grievances during the relevant time, including when he was on lockdown. Exhaustion cannot be excused under the guise of special circumstances and, in this case, the grievance procedure was available to the Plaintiff but he chose not to use it.

With regards to deliberate indifference, any alleged incidents that occurred after the Complaint were filed could not have been exhausted. Even if they were properly before the Court, Plaintiff admits that he was seen by Mashburn and received medications for PTSD, ADHD, anxiety and depression on May 5, 2018. Any disagreement that Plaintiff had with the treatments he received does not equate to deliberate indifference. In addition, Plaintiff fails to address Defendants' argument that he cannot show any substantial harm from any delay in treatment. He makes no effort to address what lifelong handicap, permanent loss, or considerable pain he suffered as a result in any delay in medical care, as required to show a substantial risk of harm.

**(5)    Evidence**[3]

**(A)    Declaration of Coy Phillips** (Doc. No. 46-4)

Coy Phillips is Chief Deputy of the Madison County Sheriff's Office. He is familiar with the Jail's policies and procedures. See (Doc. Nos. 46-5, 46-6). Pursuant to policy 7.13, if an inmate has a grievance, he or she may file it using a grievance form or using the jail kiosk. The grievance must detail the circumstances of the complaint. Grievances are routed to the Jail Administrator for a response. Inmates may appeal the response to a higher ranked officer. Newly admitted inmates are informed of the Jail's disciplinary and grievance procedures when they arrive at the Jail and attempt to use the Jail kiosk. The kiosk contains the inmate handbook, which details the policies and procedures applicable to inmates at the Jail. Included in this handbook is section XI, entitled "Grievance Procedure," which summarizes the grievance process at the Jail. Phillips helps maintain inmate grievance forms at the Jail. Phillips reviewed the Jail's inmate grievances to determine if Plaintiff ever filed any grievances. Plaintiff did file several grievances and medical requests at the Jail.

**(B)    Plaintiff's Declaration** (Doc. No. 54-2 at 1)

In a verified declaration, Plaintiff states that, on April 1, 2018, while he was housed at the Madison County Jail, the cell that Plaintiff shared with another inmate was searched and an alleged weapon was found. Plaintiff and his roommate, Mr. Rice, were locked down. Plaintiff remained on lockdown while Rice was released into the population. Defendant Denton came to Plaintiff's cell and told him he would be on lockdown indefinitely pursuant to Sheriff Harwood's orders, due to an alleged weapon being found. Plaintiff said he did not have a weapon and wanted to talk to the sheriff. On May 24, 2018, Plaintiff gave his pin number to a fellow inmate to file a grievance

---

[3] This section is not exhaustive.

for him on the kiosk regarding his lockdown without a hearing. Plaintiff filed another grievance on June 12, 2018 through a fellow inmate stating that he had just been released and was locked down again for the same offense. Plaintiff was placed in segregation from April 1, 2018 to June 13, 2018 without a disciplinary hearing. While on lockdown status, Plaintiff was denied and delayed visits to the mental health clinic and doctor-prescribed medications for a thyroid condition. Plaintiff informed Defendants of his medical conditions during booking. Plaintiff was housed at the Jail with two other inmates who either suffered similar deprivations or witnessed Plaintiff's deprivations. As a result of the lockdown and denial and delay of medication and mental health treatment, Plaintiff experienced "severe anxiety, exacerbated symptoms of PTSD, mental anguish, thoughts of suicide, and a near comatose state." (Doc. No. 54-2 at 5). Plaintiff asked staff numerous times for access to the Jail kiosk, paper grievances, writing paper, and writing implements while on lockdown, which were denied.

**(C)** **Declaration of Dean Shelton** (Doc. No. 49-1 at 3)

In a verified declaration, inmate Dean Shelton states that he was housed at the Madison County Jail with Plaintiff from March to September 2018. On or around May 2018, Shelton was locked down in segregation without receiving a disciplinary hearing in "A" Dorm by Sergeant Denton for approximately 30 days. Shortly thereafter, Denton moved Shelton to "B" Dorm, placing him in a cell by Plaintiff. Plaintiff told Shelton that he was on lockdown for allegedly possessing a weapon in his cell and that he did not receive a disciplinary hearing either. Shelton was released from lockdown and moved back to "A" Dorm and Plaintiff was released from lockdown approximately 15 days later and moved into Shelton's cell at "A" Dorm. While rooming with Plaintiff, Shelton witnessed him ask Denton and several other jailers for mental health medications and scheduled appointments to RHA. Defendants simply denied Plaintiff's requests.

Shelton saw Plaintiff persistently requesting his mental health medications and appointments to RHA and jailers threatening to tase him and lock him down if he kept bothering them. During his two-year stay at the Jail, Shelton witnessed multiple incidents of deprivation ranging from the use of excessive force, denial of disciplinary proceedings, denial of medications and access to medical services and lockdowns for extensive periods of time.

**(D)** **Declaration of Matthew Paul Tweed** (Doc. No. 49-1 at 6)

In a verified declaration, inmate Paul Tweed states that he was housed at the Madison County Jail with Plaintiff from the end of April to the beginning of June 2018. Tweed was segregated without receiving a disciplinary hearing by Sergeant Denton. Plaintiff told Tweed that he was on lockdown for allegedly possessing a weapon found in his cell and that he did not receive a disciplinary hearing. Tweed witnessed Plaintiff ask Denton and several other jailers for mental health medications and scheduled appointments to go to RHA Medical Center. Defendants and staff simply denied Plaintiff's requests. Tweed witnessed the jailers denying Plaintiff's access to practice his religion and a doctor-prescribed second mattress. At times, the jailers would deny them hygiene and writing paper.

**(E)** **Plaintiff's Deposition** (Doc. No. 46-3)

Plaintiff stated at his deposition that he arrived at the Jail March 5, 2018 and was released on September 5, 2018. (Doc. No. 46-3 at 2). A cell search located a knife in his cell on April 1, 2018. (Doc. No. 46-3 at 4). Defendant Denton came in later that day and said he was on 30-day lockdown pending the sheriff's decision because a knife was found in the cell. (Doc. No. 46-3 at 5). Denton would not let Plaintiff on the kiosk or give him any writing materials so he had to give other inmates his pin and they finally took plaintiff off the kiosk entirely. (Doc. No. 46-3 at 6). Plaintiff was allowed out of his cell three time per week for an hour. (Doc. No. 46-3 at 7). He was

on lockdown for 72 days from around April 1 to the middle of August. (Doc. No. 46-3 at 7-8). When "they" let him out, they would point tasers at him and taunt him. (Doc. No. 46-3 at 8). Plaintiff gave his pin to other inmates to file grievances for him on the kiosk. Plaintiff was off lockdown for five days in June. (Doc. No. 46-3 at 9). Later into the lockdown he could do grievances himself. (Doc. No. 46-3 at 11). April 11 is the first time Plaintiff went to the Mashburn center and got medication for his thyroid. (Doc. No. 46-3 at 12). During lockdown his anxiety worsened. (Doc. No. 46-3 at 14). During the last 15 days of lockdown Plaintiff was let out of his cell three times per week for an hour. (Doc. No. 46-3 at 7).

Plaintiff was seen at Mashburn in March or April 2018 and got medication. (Doc. No. 46-3 at 16). Bloodwork indicated that Plaintiff's thyroid was so high that it was a wonder that [he] wasn't in a coma, because [he] hadn't had [his] medication." (Doc. No. 46-3 at 15). Before he got locked up, Plaintiff told Banks that he needed his thyroid medication and other medication that would be at the pharmacy, and Banks said he would check on it. (Doc. No. 46-3 at 15).

Plaintiff received ADHD medication and Zoloft anxiety medication during lockdown when he went to RHA on May 8. (Doc. No. 46-3 at 17). Plaintiff does not remember any other times he received thyroid, ADHD, and Zoloft medications other than the two times he mentioned while he was on lockdown. (Doc. No. 46-3 at 17).

Lack of medication makes Plaintiff "think crazy stuff," makes him tired, and he is unable to sleep, he has no appetite, he thinks people are after him, and it affects blood pressure. (Doc. No. 46-3 at 18). Plaintiff also stated that the lack of a disciplinary hearing in April 2018 "caused [him] to … have severe anxiety … [and his] PTSD is twice as bad as it was. Just a lot of mental anguish." (Doc. No. 46-3 at 26). When asked whether he has any physical injuries from the disciplinary issue, he stated that "[i]t was all, pretty much, mental. Made me have thoughts of suicide. I mean,

made me – I lost everything. You know, no contact, no nothing….” (Doc. No. 46-3 at 26).

Plaintiff's family was allowed to visit him 10 or 15 days before he came off lockdown.

### (F) Time Line

3/4/18      <u>Booking Information</u> by Billy Joe Davis
<u>Medical Questionnaire</u>: “Is the Inmate presently taking medication for psychiatric disorder? Yes;” “Is the inmate presently taking medication for other? Yes ADHD MEDS, ZOLOFT;” “Has the inmate been hospitalized or seen a physician recently for any illness? Yes THYROID, AND RHA” (Doc. No. 54-3 at 17)
<u>Officer Observations</u> “Understands Questions, No;” “Depressed, Yes.” (Doc. No. 54-3 at 19)
<u>Mental Health Screening Form</u> “Does the inmate appear mentally confused? Yes.” (Doc. No. 54-3 at 21)

3/16/18      <u>Law Enforcement Contact</u> (10233088) by Plaintiff “I need my meds mars hill medical pharm thyroid and adhd.pdsd please” (Doc. No. 54-3 at 16)

3/17/18      <u>Grievance</u> (10247569) by Plaintiff “I have asked for my meds and was told I would nhave” (Doc. No. 46-7 at 4)

     <u>Grievance Closed</u> (10247569) by Plaintiff (Doc. No. 46-7 at 4)

     <u>Grievance</u> (10247609) by Plaintiff “… I am asking is for my mmeds.” (Doc. No. 46-7 at 5)

3/20/18      <u>Law Enforcement Contact Response</u> (10233088) by Tom Banks “I will check into this matter;” handwritten note: “Lance in Phar. will check on this & fill it at Mashburn. Has had nothing – last time was Oct 2017.” (Doc. No. 54-3 at 16)

4/2/18      <u>Disciplinary Report</u> (18-0000000020) violation date 4/2/18, violation time 8:00, plea: “Responsible,” checked “Waive Right to Hearing; Rule violations: “Possession of a weapon, sharpened instrument or unauthorized tools;” Sanctions: “Major” “Disciplinary separation for a period not to exceed 30 days;” Loss of privileges: “Games (cards, dominos, etc); notes: “PER THE SHERIFF HE IS TO REMAIN ON LOCKDOWN UNTIL …” 30 days beginning 4/7/18, ending 6/6/18. (Doc. No. 46-3 at 29)

4/22/18      <u>Grievance</u> (1063527) by Plaintiff: “In need to get to RHA Mashburn got me a referral to go thank you for getting me my other meds tom the old eric that trys not to cause problems is back now thinking straight again thank you.” (Doc. No. 46-3 at 28)

4/23/18      <u>Grievance Response</u> (1063527) by Tom Banks: “I will have you seen by RHA sir.” (Doc. No. 46-3 at 28)

| | |
|---|---|
| 4/25/18 | **<u>Complaint Filed</u>** (Doc. No. 1) |
| 5/8/18 | <u>RHA Psychatric Encounter</u> last seen on 6/17 at which time Prozac and Vyvanse were started; "He has been getting Vyvanse through Mashburn up until recently. He thinks Prozac made his depression worse." (Doc. No. 49-1 at 1) |
| 5/9/18 | <u>Grievance</u> (10835456) by Plaintiff "I would like to speak to buddy harwood in person" (Doc. No. 46-7 at 9) |
| 5/10/18 | <u>Grievance Response</u> (10835456) by Tom Banks "I will forward to Sheriff Harwood" (Doc. No. 46-7 at 9) |
| 5/24/18 | <u>Grievance</u> (11002169) by Plaintiff "I asked jeff neal if I could order cominsary he said have you got money on your account I said yes that tells me I can he did not say either way I should get to ive been on lock down for over fifty days **ive have never been in front of disiplanary** and by rule book I should have by 7 days all I wont is visits and snack packs I have family also after so long its cruel and unusall punishment I have filled a 1983 civil rights complain in western district because I haven't been treated right and still ant my mat was taken for 5 days and I have no cold water in my cell and have let everybody no." (Doc. No. 46-7 at 10) (emphasis added) |
| 6/6/18 | <u>Grievance</u> (11152447) by Plaintiff: "I need my meds filled and would like to know about my lock down status and if my papers for rehab has been sent off." (Doc. No. 46-7 at 11) |
| 6/8/18 | <u>Grievance Response</u> (11152447) by Tom Banks "I will check with jail staff to see what meds needs to be refilled …." (Doc. No. 46-7 at 11) |
| 6/14/18 | <u>Plaintiff Released from Lockdown for 5 days</u> (Doc. No. 46-3 at 9) |
| 6/26/18 | <u>Grievance</u> (11373255) by Plaintiff "I have been told I would get help to go to rehab jeff neal and sheriff harwood its been 3 weeks they haven't gotten my app at first at blue ridge I think jef and sheriff is just keeping me from going retaliating because of law suite or because Michael garision has told my family he would make sure I get the max on my charges instead of helping me like I begged when he stopped me." (Doc. No. 46-7 at 15) |
| | <u>Medical</u> (11320037) by Plaintiff "I need to see frank soon at r.h.a." (Doc. No. 46-7 at 14) |
| | <u>Medical Response</u> (11320037) by Denton: "I will check to see if its time." (Doc. No. 46-7 at 14) |
| | <u>Grievance</u> (11374445) by Plaintiff "I put in medical to see mental health as was |

told by francy dention she would check and see if it was time its not up to her to see if its time its mental health and I said I needed to see them but I guess that will be put off like everything else medical comes first mental health can not be put off or denied to any inmate its in your handbook." (Doc. No. 46-7 at 17)

Grievance Response (11374445) by Denton "Eric, we can not make the Medical Center see you any sooner. I have put in for you a Dr appointment." (Doc. No. 46-7 at 17)

6/29/18    Medical (11320037) by Plaintiff "its time" (Doc. No. 46-7 at 14)

7/3/18    Medical (11460038) by Plaintiff "I am out of meds and need to go to rha I have asked and asked." (Doc. No. 46-7 at 18)

Grievance (11460079) by Plaintiff "I need my meds and to see rha im out and have been out and am feeling bad its not good that mental health meds and ive been asking for two weeks now (Doc. No. 46-7 at 19)

7/4/18    Grievance Response (11460079) by Francy Denton "You will get the Medication on your appointment time. Demanding this doesn't get you seen any sooner. It isn't the Captain and I who decides what day and time you go to the Dr." (Doc. No. 46-7 at 19)

7/18/18    Grievance (11635724) by Plaintiff, "I have asked and asked to go to rha for mental health I've been out of meds for four weeks put in for them several times and ask every officer that's give them out." (Doc. No. 46-7 at 21)

8/6/18    Grievance (11868960) by Plaintiff "…I am aminding my law suit beouse of the indefreance and beign denied medical for a month after being told I had a appointment." (Doc. No. 46-7 at 22)

8/7/18    Grievance Reply (11868960) by Plaintiff "I need to go to rha it has been since 6/23/2018." (Doc. No. 46-7 at 22)

8/9/18    Grievance Second Response (11868960) by Captain Quintero, "You will have an appointment at RHA." (Doc. No. 46-7 at 22)

8/10/18    Grievance (11635724) by Denton "We have ask for you a Dr appointment and waiting on RHA." (Doc. No. 46-7 at 21)

8/13/18    Medical Response (11460038) by Captain Quintero, "issues handled by Captain Neill and/or Sgt Denton." (Doc. No. 46-7 at 18)

8/14/18    RHA Psychiatric Encounter follow up from 5/8 appointment; "He has been out of medication for over two months and has been waiting nearly two months to see me." (Doc. No. 49-1 at 2)

"Suicidal Ideation: No; Homicidal Ideation: No; Preoccupation w/Violence: No."
(Doc. No. 54-3 at 27)
Diagnosis: "Posttraumatic stress disorder…, Major depressive disorder, Recurrent
episodes, Mild…, Attention-deficit/hyperactivity disorder, Predominantly
inattentive presentation." (Doc. No. 54-3 at 27)

8/15/18    Grievance (11973897) by Plaintiff "captain thank you for getting me to r.h.a.
yesterday my doctor frank ruso stated to my that he had my meds called in to
mashburn a month ago to be picked up so I would have enough to last until I had
seen him yesterday he also sent scrips yesterday with francy dention if me meds
was called in a month ago why have I not got them they should be at mashburn per
frank ruso at r.h.a." (Doc. No. 46-7 at 23)

Grievance Response (11973897) by Captain Quintero, "I went over to Mashburn
today you should have them all now let me know if you don't" (Doc. No. 46-7 at
23)

8/17/18    Grievance (23000898) by Plaintiff "caption I was given my meds this morning my
levethrosen is priscribed to take one hour before breakfast with no other meds for
one hour I had my other meds in my cell to take as priscribed ben came in advtook
them the staff here is not trained in the medical field to give out priscription meds
and there is not a nurse here to give them out so I feel I done the right thing trying
to take my meds as priscribed it plainly states not to take with any other meds for
one hour and one hour before breakfast thank you." (Doc. No. 46-7 at 26)

8/17/18    Grievance Response (23000898) by Captain Quintero, "officer found you not
taking your meds this am and had to take action." (Doc. No. 46-7 at 26)

8/21/18    Medical (12045374) by Plaintiff need to go to RHA for mental health help, missing
meds, wants to go to rehab (Doc. No. 46-7 at 31)

Medical (12047325) by Plaintiff I need to go to RHA (Doc. No. 46-7 at 32)

Medical Response (12047325) by Denton "RHA has taken you off the medication."
(Doc. No. 46-7 at 32)

8/22/18    Medical Response (12045374) by Captain Quintero, "in order to get into rehab you
wanted to come off your meds is this a change." (Doc. No. 46-7 at 31)

Medical (12062819) by Plaintiff not asking for meds; asking for another
appointment, needs a mental health appointment at RHA (Doc. No. 46-7 at 34)

Medical Response (12062819) by Quintero, what are you asking me (Doc. No. 46-
7 at 34)

Grievance (12065061) by Plaintiff re warrant and rehab (Doc. No. 46-7 at 35)

Grievance Response (12065061) by Quintero, will come meet with you today (Doc. No. 46-7 at 35)

8/23/18     Medical (12075053) by Plaintiff, please get appointment with RHA (Doc. No. 46-7 at 36)

Medical Response (12075053) by Quintero, I will make you an appointment (Doc. No. 46-7 at 36)

9/5/18     Plaintiff Transferred to DOC (Doc. No. 46-3 at 2)


## II.     STANDARD OF REVIEW

### (1)     Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(2)    Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. The PLRA's exhaustion requirement applies to all inmate suits about prison life. Porter v. Nussle, 534 U.S. 516 (2002). Exhaustion is mandatory. Id. at 524 (citation omitted); Jones v. Bock, 549 U.S. 199, 211 (2007). Exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id. A prisoner is not entitled to exhaust administrative remedies during the pendency of an action. Cannon v. Washington, 418 F.3d 714, 719 (7th Cir. 2005); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999). The PLRA requires "proper" exhaustion, that is, "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford v. Ngo, 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).

"The level of detail necessary in a grievance to comply with the grievance procedures will

18

vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." <u>Jones</u>, 549 U.S. at 218. It is well settled that a grievance does not have to mention a defendant by name so long as the grievance gives the defendant fair notice of the claim. <u>See</u> <u>Moore v. Bennette</u>, 517 F.3d 717, 729 (4th Cir. 2008). However, regardless of whether a particular defendant is named in a grievance, if the grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate. <u>See</u> <u>Davidson v. Davis</u>, 2015 WL 996629 at *3 (W.D.N.C. Mar. 6, 2015) (citing <u>Johnson v. Johnson</u>, 385 F.3d 503, 516-17 (5th Cir. 2004)).

**(3)**     **<u>Deliberate Indifference</u>**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir.1996). The Constitution "does not mandate comfortable prisons, … but neither does it permit inhumane ones." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981)). Thus, prison official must provide sentenced prisoners with adequate food, clothing, shelter, and medical care, and "take reasonable measures to guarantee the[ir] safety…." <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984); <u>see</u> <u>Farmer</u>, 511 U.S. at 832-34. Inmates' claims that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. <u>See</u> <u>Pressly v. Hutto</u>, 816 F.2d 977, 979 (4th Cir. 1987). As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs. <u>See</u>

Estelle, 429 U.S. at 103-04.

To state a case of deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer, 511 U.S. at 825. An actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. It is enough that the defendant's actions exposed the plaintiff to a "substantial risk of serious harm." Farmer, 511 U.S. at 837; see also Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) (deliberate-indifference standard requires prisoner to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions") (citation omitted). Mere negligence or malpractice does not violate the Eighth Amendment. Miltier, 896 F.2d at 852. However, "officials evince deliberate indifference by acting intentionally to delay or deny the prisoner adequate to medical care or by ignoring an inmate's known serious medical needs…. A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." Sharpe v. S. Carolina Dep't of Corr., 621 Fed. Appx. 732, 734 (4th Cir. 2015)); (citing Estelle, 429 U.S. at 104-05, Young v.

City of Mt. Ranier, 238 F.3d 567, 576 (4th Cir. 2001); McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)); Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009) (a delay or interference with treatment can be sufficient to constitute a violation of the Eighth Amendment).

Because Plaintiff was an arrestee or pre-trial detainee at the relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment rather than the Eighth Amendment, but the analysis is the same. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); see also Martin v. Gentile, 849 F.2d 863 (4th Cir. 1988) (applying the Fourteenth Amendment to an arrestee's deliberate indifference claim); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment); see Lanier v. Henderson Cnty. Det. Ctr., 2016 WL 7007537 at *2, n. 3 (W.D.N.C. Nov. 29, 2016) (noting that the Supreme Court in Kingsley did not explicitly extend the objective reasonableness standard outside the excessive force context); see, e.g., Duff v. Potter, 665 Fed. Appx. 242, 244-45 (4th Cir. 2016) (applying the Kingsley standard to a detainee's excessive force claim but not his medical need claim).

**(4)**     **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of

whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting Butz v. Economou, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ziglar v. Abbasi, 137 S.Ct. 1843, 1866 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." Anderson v. Creighton, 483 U.S. 635, 640 n. 2 (1987). Accordingly, the Supreme Court has "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id. For a right to be clearly established, the "contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. This includes consideration of the state of the law at the time of the alleged violation as well as the "information possessed" by the officer to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. Id. at 641. However, an official's subjective belief is irrelevant. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously

been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III. DISCUSSION

### (1) Exhaustion

Defendants argue that Plaintiff failed to exhaust due process claim with regards to the disciplinary proceedings. Plaintiff argues that the PLRA's exhaustion requirement does not apply because he was a pretrial detainee rather than a prisoner at the relevant time, and he also appears to argue that the administrative remedy procedure was not "available" to him while he was on lockdown.

Plaintiff's belief that the PLRA did not apply to him because he was a pretrial detainee rather than a prisoner is incorrect. To the extent that Plaintiff argues that the Jail's grievance procedure was not "available" to him while he was on lockdown, this argument is refuted by the record. Defendants have submitted evidence showing that the Jail has a grievance procedure of which all inmates are informed at booking and when they log into the kiosk. In addition, policy calls for paper grievance forms to be provided upon request. Plaintiff claims that he was refused paper grievance forms and that he was unable to access the kiosk personally during lockdown. However, the record shows that Plaintiff submitted multiple grievances while he was on lockdown. This includes a grievance about the lack of due process in the disciplinary proceeding on May 24, 2018, while Plaintiff was still on lockdown. (Doc. No. 46-7 at 10). During this period, Plaintiff also submitted numerous medical requests, dental requests, and had a law enforcement contact during that time. Plaintiff also filed the instant lawsuit during that period on April 25, 2018.

Plaintiff failed to exhaust the available administrative remedies with regards to his due

process claim before filing his Complaint in this action. Defendants' Motion for Summary Judgment will be granted on the due process claim and it will be dismissed without prejudice.

**(2)** **Deliberate Indifference**

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs because he was deprived of medication and treatment for a thyroid condition, ADHD and PTSD while he was on lockdown. He claims that he finally received thyroid medication on April 18, 2018, but that he had not received treatment for ADHD or PTSD by the time he filed the Complaint on April 25, 2018. The lack of medication made him drowsy, affected his blood pressure, caused anxiety, and made him have crazy thoughts.

The record reflects that Defendants, none of whom are medical personnel, responded promptly when Plaintiff requested medical care. Plaintiff's first contact with any of the Defendants about a request for thyroid, ADHD and PTSD medications was on March 16, 2018 via a Law Enforcement Contact. (Doc. Nos. 54-3 at 16). Defendant Banks responded just two days later on March 20, stating that he would check on the matter and a handwritten note indicates that the request would be filled at Mashburn. (Doc. No. 54-3 at 16). On April 22, Plaintiff requested a referral to Mashburn and thanked Defendant Banks for "getting [him his] other meds…." (Doc. No. 46-3 at 28). Defendant Banks responded the next day that he would have Plaintiff seen by RHA and that visit occurred on May 8, 2018. (Doc. No. 46-3 at 28). Plaintiff now alleges that he did not have his medications during this period, which is refuted by his own contemporaneous written statement that he had his "other meds." (Doc. No. 46-3 at 28). He fails to explain how any of the Defendants would have known that further action was needed in light of Plaintiff's lack of requests during that period and his affirmative representation on April 22 that he was receiving his "other meds." <u>Cf.</u> (Doc. No. 54-3 at 27) (RHA psychiatric encounter notes reflecting that Plaintiff

was out of medication for over two months and had waited for nearly two months to see the doctor).

The records indicate that Plaintiff next asked for his prescriptions on June 6, 2018. (Doc. No. 46-7 at 11). Defendant Banks responded two days later that he would check with Jail staff. (Id.). On June 26, 2018, Plaintiff asked to see RHA "soon" and Defendant Denton responded that she would "check to see if it's time." (Doc. No. 46-7 at 14). When Plaintiff complained, Denton explained that she had put in a doctor appointment for him and that they "can not make the Medical Center see [him] any sooner." (Doc. No. 46-7 at 17). Plaintiff requested medications and an RHA appointment several more times. Defendant Denton and Captain Quintero explained that an appointment had been requested and that medical scheduling is not within staff's control. See (Doc. No. 46-7 at 19). The day after Plaintiff went to RHA on August 14, 2018, he thanked Captain Quintero for the appointment and explained that his medications should be at Mashburn. Captain Quintero went to Mashburn that same day to retrieve Plaintiff's medications and told Plaintiff to follow up if he did not get them. (Doc. No. 46-7 at 23).

Plaintiff fails to rebut the foregoing with any evidence that Defendants purposefully denied or delayed medical care or that any delays were due to anything more than negligence. See Miltier, 896 F.2d at 85; see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances.") (quotations omitted).

Moreover, Plaintiff has failed to show that he was at risk of serious harm. He claims that his thyroid level was dangerously high and that medical personnel told him during his April 11 visit that he could have gone into a coma. However, Plaintiff fails to explain how any of the non-medical Defendants, who promptly scheduled him for an appointment, would have known that the thyroid issue was urgent and exposed Plaintiff to an risk of serious harm without treatment on an

emergency basis. With regards to his other medications, Plaintiff alleges that their absence made him sleepy, affected his appetite, and caused increased anxiety. Plaintiff fails to explain how the non-medical Defendants would have known that the lack of medication or delay in receiving treatment risked serious harm. See generally Farmer, 511 U.S. at at 837 (a person is only deliberately indifferent when he disregards a risk of harm of which he is aware); Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (prison official was not deliberately indifferent even though he had actual knowledge of facts from which a reasonable person might have drawn an inference that defendant's actions exposed plaintiff to a substantial risk of serious harm because he did not actually draw the inference). Plaintiff has failed to demonstrate that any of the Defendants' actions or inactions with regards to his medications and appointments knowingly exposed him to a risk of serious harm and, based on the foregoing, Defendants' Motion for Summary Judgment will be granted on the medical deliberate indifference claim.

## (3)     **Qualified Immunity**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not made out a violation of a clearly established right and their actions were reasonable under the circumstances.

The undisputed records show that Defendants are non-medical personnel who responded promptly and reasonably to Plaintiff's requests for treatment and medication. Plaintiff has failed to demonstrate that any of the Defendants acted with deliberate indifference or violated any clearly established right. See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 306 (4th Cir. 2004) (reversing denial of summary judgment for officer defendants under qualified immunity analysis where there was no evidence suggesting that the officers recognized that their actions were inappropriate under the circumstances); Deck v. Rubenstein, 2016 WL 2726543 at *5 (N.D. W. Va. April 13, 2016),

*report adopted,* 2016 WL 2636300 (N.D. W. Va. May 6, 2016) (warden and department of corrections commissioner were entitled to qualified immunity on plaintiff's allegation that they "rubber stamped" his grievances and failed to intervene when he complained about his medical care because they had no involvement in direct day-to-day responsibility for health services and plaintiff failed to specify any direct acts taken by either defendant that violated his constitutional rights). Plaintiff has not come forward with any evidence that Defendants violated his clearly established rights, and therefore, Defendants are entitled to qualified immunity. Their Motion for Summary Judgment is also granted on this basis.

## IV.    PENDING MOTIONS

First, Plaintiff has filed a "Declaration in Support of Motion for Appointment of Counsel," (Doc. No. 37), in which he again asks the Court to appoint him a lawyer. He argues that this is a complex case for an incarcerated inmate, it involves medical issues that will require expert testimony about Plaintiff's condition, Plaintiff lacks the legal training for a jury trial, the case requires further discovery including depositions, Plaintiff's allegations are in direct conflict with Defendants' version of events, Plaintiff has limited access to legal materials and no ability to investigate the facts, Plaintiff is unable to submit documents through the Court's electronic communication service, and Plaintiff is indigent and without legal training.

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel. Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Plaintiff has failed to demonstrate the existence of exceptional circumstances and his request for the appointment of counsel will be denied.

Second, Plaintiff has filed a Motion to Compel and Request for Production of Documents,

(Doc. No. 39), in which he argues that he submitted interrogatories to Defendants around October 28, 2018, asking for the full name and mailing address of the information technicians responsible for handling Madison County Jail computer technology information via the kiosks at the Madison County Jail. Defendants objected on December 17, 2018. Plaintiff seeks to compel Defendants to provide this information because he has questions that only a technician/expert could answer and that he needs to subpoena the information technician for expert testimony. Plaintiff further claims that he submitted his second set of interrogatories on December 26, 2018 in which he requested the housing unit and cell that Plaintiff occupied when the alleged weapon was found, and to identify the officer whose initials are shown on the medication dispensing logs of August 2018. Defendants objected on January 23, 2019 because these interrogatories exceeded the limits in the Court's Pretrial Order and Case Management Plan. Plaintiff seeks copies, in their original formats, of the Madison County Sheriff's Office medication dispensing logs from March to July 2018, copies of grievances, medical, law enforcement, and lawyer contact from the kiosk for Plaintiff between March 5, 2018 and September 5, 2018.

Defendants filed a Response, (Doc. No. 44), arguing that the identity of the information technology person is not relevant to Plaintiff's § 1983 claims or the Defendants' defense, and that Plaintiff has failed to identify good cause to exceed the limits set forth in the Pretrial Case Management Order, and that the interrogatories are irrelevant. Further, Defendants have already produced all documents in their possession regarding grievances and medication logs.

The rules of discovery are to be accorded broad and liberal construction. See Herbert v. Lando, 441 U.S. 153, 177 (1979); Hickman v. Taylor, 329 U.S. 495, 507 (1947). All civil discovery, whether sought from parties or nonparties, is limited in scope by Rule 26(b)(1) in two fundamental ways: (1) the matter sought must be "relevant to any party's claim or defense," and

(2) discovery must also be "proportional to the needs of the case." <u>Va. Dep't of Corr. v. Jordan</u>, 921 F.3d 180, 188 (4th Cir. 2019) (quoting Fed. R. Civ. P. 26(b)(1)). Relevance on its own is not a high bar; the proportionality requirement "relieves parties from the burden of taking unreasonable steps to ferret out every relevant document." <u>Id.</u> Whether to grant or deny a motion to compel is generally left within the district court's broad discretion. <u>Id.</u>

Plaintiff's Motion to Compel addresses interrogatories that are irrelevant and/or which exceed the scope of the Pretrial Order and Case Management Plan, (Doc. No. 22), and Plaintiff fails to demonstrate good cause to exceed the limits contained in the Pretrial Order. Therefore, Plaintiff's Motion to Compel will be denied.

## V.      CONCLUSION

In sum, for the reasons stated herein, Defendants' Motion for Summary Judgment is granted, Plaintiff's pending Motions are denied, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1.   Defendants' Motion for Summary Judgment, (Doc. No. 45), is **GRANTED**.

2.   Plaintiff's "Declaration in Support of Motion for Appointment of Counsel," (Doc. No. 37), is **DENIED**.

3.   Plaintiff's Motion to Compel and Request for Production of Documents, (Doc. No. 39), is **DENIED**.

4.   The Clerk of Court is instructed to close this case.

Signed: September 6, 2019

Frank D. Whitney
Chief United States District Judge